# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

CHARLES WALKER,      )
         )
     Petitioner,      )
         )
v.      )      No. 3:11-cv-00545
         )      Chief Judge Haynes
         )
HENRY STEWARD, Warden,      )
         )
     Respondent.      )

## MEMORANDUM

Petitioner, Charles Walker, a state inmate, filed this pro se action under 28 U.S.C. § 2254, seeking the writ of habeas corpus to set aside his state convictions for rape of a child for which Petitioner received an effective sentence of 20 years. (Docket Entry No. 1). In his petition, Petitioner asserts the following claims: (1) denial of effective assistance of trial counsel on multiple grounds; (2) prosecutorial misconduct; (3) cumulative error; (4) a sentencing violation under Blakely v. Washington, 542 U.S. 296 (2004); and (5) due process violation by the trial court's failure to admit evidence of Petitioner's good character. (Docket Entry No. 1). After a preliminary examination of the petition, the Court concluded that Petitioner had stated a colorable claim for relief. (Docket Entry No. 4). The Court entered an Order (Docket Entry No. 4), directing the Respondent to answer or otherwise respond to the petition. Respondent responded with a motion to dismiss the action (Docket Entry No. 19), to which Petitioner responded. (Docket Entry No. 34).

For the reasons set forth below, the Court concludes that based upon a review of the state record, Petitioner is not entitled to habeas relief as the state court made reasonable determinations

1

of his claims under federal law.

## A. Procedural History

In 2003, Petitioner was convicted by a Montgomery County jury of two counts of rape of a child, and one count of aggravated sexual battery. State v. Charles Walker, No. M2005-165-CCA-R3-CD, 2006 WL 3313651 (Tenn. Crim. App. Nov.15, 2006) (perm app denied March 12, 2007). Petitioner was sentenced to two concurrent twenty-year terms of incarceration on the rape convictions, and an eight-year consecutive sentence for the aggravated sexual battery conviction. Petitioner's aggravated sexual battery conviction was overturned on appeal, but his rape convictions were affirmed. Id. On March 7, 2008, Petitioner filed a petition for post-conviction relief in the Circuit Court for Montgomery County. The post-conviction court denied relief, and the Tennessee Court of Criminal Appeals affirmed. Charles Walker v. State, No. M2010-0449- CCA-R3-PC, 2011 WL 795866 (Tenn. Crim. App. March 8, 2011) (perm. app. denied July 14, 2011). Petitioner filed this action on May 26, 2011.

## B. Review of the State Court Record

As to the facts underlying Petitioner's conviction, the Tennessee Court of Criminal Appeals found[1] as follows upon post-conviction review:

### State's Proof

The victim testified that she was born on September 9, 1988, was currently in the eighth grade, and had lived for the past two years with her father and stepmother in Riverton, Illinois. She said her mother married the defendant in 1998 when she was ten years old, and from 1998 until 2001 she lived with the defendant, her mother, and her younger sister, C.M., at 315 Barkwood Court in Clarksville. The victim testified

---

[1] State appellate court opinion findings can constitute factual findings in a habeas action, Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness. 28 U.S.C. § 2254(e).

2

that the defendant "was making [her] have sex with him" during the time she lived at the Barkwood Court residence. She said the defendant began sometime in 1999 by touching her breasts and vagina over her clothing but then progressed to touching her private parts under her clothing. The victim stated that the inappropriate touching also involved placing her mouth on the defendant's penis and rubbing his penis with her hand. In addition, she said that the defendant penetrated her vagina with his penis on numerous occasions and in various locations throughout the house. The victim testified: "He stuck his penis in my vagina in the living room on the floor and on the couch, and then on the bathroom floor, in his bed, or the hot tub."

The victim said that the intercourse occurred either in the early mornings, after her mother had already left for work and while C.M. was still asleep in her bedroom, or in the afternoons, before her mother or C.M. arrived home. She stated that her mother worked in Nashville and left for work at 5:30 a.m. and returned about 4:00 p.m. During this time period, the defendant was a carpenter and worked "[w]henever he got a call." The victim testified that when she entered middle school, she rode a different school bus from her sister, who was two years younger and in a grade below her in school. The victim said her school bus brought her home approximately thirty minutes before C.M. arrived home.

The victim was unable to remember when the defendant first penetrated her vagina but recalled that the last time occurred in the living room of the Barkwood Court residence on May 28, 2001, when she was twelve years old. She said she remembered the date because it was within a week of when her father came to pick her up for her summer visitation with him and his wife in Illinois. The victim testified that her mother was at work and her sister was asleep in her bedroom. She stated that the defendant placed a towel on the floor, laid her down on the towel, stuck his penis inside her vagina, and moved up and down until "he told [her] he had come." She said that the defendant did not use a condom and had told her that he "had some kind of surgery so he couldn't make babies." She testified that when the defendant had finished, she covered her vagina with a towel, went to the bathroom, and tossed the towel in the dirty clothes hamper.

When prompted, the victim also recalled that the defendant had penetrated her vagina with his penis in the living room of the residence during the school spring break before her father picked her up for her 2001 summer visitation. Asked what she remembered about that event, she testified: "The week of Spring Break, my Mom would be at work and he [the defendant] would wake me up about 5:30 in the morning and he would make me have intercourse with him and then my sister would be asleep in her bed." The victim said that the intercourse occurred on the living room floor but that a towel was not used. After having her memory refreshed with her prior statement, the victim also recalled that it "was in January" when the defendant first started touching her. When asked what kind of touching occurred at

3

that time, she said that it was touching over her clothing.

The victim testified she was afraid to tell anyone about the abuse because she "thought it was [her] fault and [she] would get yelled at." She stated that her mother eventually found some sexually explicit emails that she and the defendant had been exchanging while she was visiting her father in Illinois. The victim explained that she exchanged the emails with the defendant "[b]ecause of the way he was treating [her] when [she] was with him, and [she] felt that just to make him happy, it would make him do it less and less." She said her mother deleted the emails but told her mother, the victim's maternal grandmother, about them. She said that in response, the victim's grandmother, who lived near the victim's father in Illinois, took the victim to a local park and began berating her:

When my Mom found out, she told my Grandma and I was up with my Dad in Illinois and it was around my sister's birthday, July, and my Grandma she picked me up and she said we were going to go shopping and she took me to one of the parks there and she was sitting there, yelling at me, telling me that I was a liar, saying it was all my fault.

The victim testified that the next adults who questioned her about the abuse were her father and stepmother, a police detective she spoke with by telephone, and an Illinois social worker her father took her to see. She said she was scared because she thought it was her fault and she would get into trouble. She also said that she and her mother did not have a good relationship and were not close.

On cross-examination, the victim acknowledged that she told Karen Morelock, the Illinois social worker who interviewed her on July 5 and July 19, 2001, that she thought she was the one who had deleted the emails, that she did not do anything with her mouth to the defendant, and that the sexual touching started in January 2000, as opposed to January 1999 as she stated in her direct examination testimony. At defense counsel's request, the victim read the following portion of her July 19 statement aloud: "I wouldn't do anything with my mouth to him, but he would lick my genital area." She agreed that the following statements in her July 19 statement were true: "It would be everyday beginning in January 2000"; "He would lick me, I had sex with him everyday for over one year"; and "[E]very once in a while, we would have sex one time in the morning and then when I would get home from school." The victim also testified, however, that her statement on direct examination that the abuse began in 1999 was true. She said the defendant first began touching her in January 1999, when she was ten years old and within a few months of his October 1998 marriage to her mother. The victim identified a letter she had written to her father and stepmother stating that she wanted to live with them when she turned thirteen, and she acknowledged that she was frustrated when her mother told her that the decision of where she would live was not solely up to her.

4

On redirect examination, the victim testified that she did not know how many times she had sexual contact with the defendant from the time she was ten until the last episode that occurred on May 28, 2001. She agreed that there were times when she rubbed the defendant's penis, times when he ejaculated and times when he did not, and times when she touched him with her mouth. She said she could not remember every instance of sexual contact because it did not happen every day. On re-cross examination, she testified that when she told Ms. Morelock that "[i]t would be everyday beginning in January of 2000," she was referring to the sexual touching, not intercourse. She also explained that she had told Ms. Morelock that the sexual touching began in January 2000 because she thought 2000 was the year that she was ten.

Detective Alan Charvis of the Clarksville Police Department testified that he was assigned to investigate the case on July 5, 2001, a few days after the defendant's two adult daughters, Cindy Morgan and Althena Walker, reported the defendant to the police. He said he asked Morgan to record her next conversation with the defendant and provided her with a tape recorder but did not tell her what to say. He testified he subpoenaed the records of WebTV, the internet company that provided email service to the defendant's home, but was unable to retrieve any emails between the victim and the defendant. He said that he did not find any emails during his search of the defendant's home or traces of semen in the home, despite using a light source to search the living room carpet, couches, and other surfaces. He testified that his understanding was that there was no computer associated with WebTV and therefore no permanent record of deleted emails. On cross-examination, he acknowledged he made no attempt to search for deleted emails on the hard drive of the computer the victim had used in Illinois.

The defendant's younger daughter, twenty-four-year-old Athena Dawn Walker, testified that the defendant married the victim's mother after his first wife, the witness's mother, passed away in 1996 from brain cancer. She said that on June 30, 2001, she received a telephone call from her older sister, Cindy Morgan, which caused her to go to Morgan's house to discuss something Morgan had heard about the defendant. The next morning, the defendant telephoned her and, without mentioning specifics, began apologizing for what he had done. She said she asked the defendant, "[H]ow long has it been going on?" meaning how long had he been having sexual relations with the victim. She stated that he told her that it had been going on for six or seven months and that he was going to seek counseling.

The witness testified that after her phone conversation with the defendant she went first to her sister's home to discuss the situation further and then to the defendant's home, where she found that neither the defendant nor his wife were willing to talk with her about the issue. The next day, she telephoned the defendant and told him

5

that she thought she needed counseling to handle his revelations. She said the defendant asked her not to see a therapist, telling her that he would be arrested if she spoke about what had happened. She testified the defendant explained to her how he was going to take care of the problem: "He told me that he was going to talk to a therapist about feelings that he was having, he wasn't going to say that he acted on them, he was just going to try to go get some counseling to try to help him[.]"

The witness testified that when she later called the defendant, he told her he had set up an appointment to see a therapist in three weeks. She said she was upset and told him that she did not want to have to wait three weeks to talk to someone. The defendant repeated that she would cause him to be arrested, and, in the background, she heard the victim's mother yelling that if she talked to a therapist it could cause her to lose custody of her daughters. The witness testified that after hanging up the phone she went directly to her sister's home, where she and her sister decided to go to the police.

On cross-examination, the witness testified that the defendant was a great father, that he never did anything sexually inappropriate to her, her sister, or her friends, and that she had never suspected him of "doing sexually inappropriate things." She acknowledged that she had stayed for a day or two in the Barkwood Court residence, her childhood home, after the defendant married the victim's mother, but the victim's mother "got frustrated" with her, and the defendant asked her to leave. She denied that this had caused a "bad falling out" between her and the defendant. She also acknowledged that the defendant never directly admitted to her that he had engaged in any sexual act with the victim.

The defendant's older daughter, thirty-one-year-old Cynthia Jean Morgan, testified that the defendant called her at the end of June 2001 to tell her that he was in trouble because he had been having sexual relations with the victim and his wife had found out about it. She said the defendant divulged "in a round-about-way" that he had been having sexual relations with the victim, but she did not ask him any detailed questions about what kind of sexual relations he meant. She stated that the defendant told her that his wife had learned about the relationship after intercepting some email and that he feared she was going to turn him in to the authorities. Morgan said that when she told the defendant she thought he deserved to be punished for what he had done, he replied that he would rather die than go to jail.

Morgan testified that she told her sister about the defendant's revelations later that day and that the following day the defendant called to ask her to stop her sister from seeing a counselor. According to Morgan, the defendant was concerned that he would be arrested if either she or her sister talked to a counselor about what he had done. Additionally, during one of her subsequent telephone conversations with the defendant, she was able to overhear the victim's mother in the background expressing

6

her concern that she would lose custody of her daughters. Morgan said that on July 2 the defendant called her again to tell her that if either she or Athena went to see a counselor, they would deny that anything had happened. She testified that, later that same afternoon, she and Athena discussed the issue and then went to the police station to report the defendant.

Morgan testified that Detective Charvis contacted her a short time later asking if she would tape-record a conversation with the defendant. She said she agreed and on July 5, 2001, called and recorded a conversation with the defendant and his wife. The tape recording of that conversation was admitted as an exhibit and played before the jury. The transcript of the conversation, also admitted as an exhibit, reads in pertinent part: CINDY: The other day when we were over there, I asked you if you were gonna get [the victim] help and you said, yes, you would never deny her that but if Athena and I can't even go get help, how's [the victim] gonna get help?

[DEFENDANT]: Not right now. When she get's [sic] older and ask[s] for it. I don't think she'll ask for it right now. You understand what I'm saying.

....

CINDY: I don't know if a twelve year old knows to ask for help, Dad. She may not realize what your [sic] doing to her is wrong.

[DEFENDANT]: Yes, she does realize that. She does realize that.

CINDY: So she's probably gonna think it[']s okay for her to sleep with [a] 50 year old when she's 15 or 16.

[DEFENDANT]: No. No. No she's not. Cause we've already discussed it here and we're gonna sit down and talk with her.

CINDY: I just don't want her to think all this is her fault.

[DEFENDANT]: I don't either and we're gonna let her know, this is not all her fault. I know that. I don't want her to feel like it's her fault. We're gonna do it right, where she understands what was going on was wrong.

....

CINDY: I just feel like at 29 years old, I need professional help to find out, after finding out that my Dad is a child molester. I can't imagine how a 12 year old would feel. I'm having a hard time.

7

[DEFENDANT]: Try to take some heart, Cindy, to know that I realize I made a mistake, it's never gonna happen again. It's never gonna happen again. Please try and get some conciliation in that. It will not happen again and I promise you that on my soul.

CINDY: I've just been praying a lot about this.

[DEFENDANT]: I've been praying a lot too. I will be getting back into church, somewhere. I mean I've got a lot of praying yet to do. (pause) But she is not gonna think it is alright [sic]. I mean she's gonna know what we've done is wrong. She already knows but we're gonna reaffirm that.

On cross-examination, Morgan testified that the defendant was a good and loving father to her when she was growing up and that he never did anything sexually inappropriate to her or her friends. She acknowledged she wrote in her statement to police that the defendant had "sexually touched" the victim. She also acknowledged that she would have been upset even if he had merely confessed that he was having sexual feelings toward a twelve-year-old, as opposed to sexual relations. On redirect, however, she testified that she would not have reported him to the police if she had understood him to say only that he had sexual feelings for the victim.

**Defendant's Proof**

The fifty-one-year-old defendant testified that he had lived in the eleven-hundred-square-foot Barkwood Court residence for twenty-seven years; had been married to his first wife for almost twenty-five years until she passed away on July 21, 1996, from brain cancer; had been honorably discharged from the military in 1972; and had never been in trouble before the allegations arose in the instant case. He said he had always maintained steady employment and had gotten a job at Hobby Lobby after his release from jail following his July 5, 2001, arrest in the case. The defendant also testified that he had been a member of the Hazardous Materials Team for the Montgomery County Emergency Management Agency, delivered meals for Meals on Wheels, had been a volunteer firefighter and had taught numerous classes at the Ashland City Fire Department, and was a member of the Masonic Lodge.

The defendant testified he married the victim's mother on Halloween 1998, and she and her two daughters moved from Illinois to live with him in his Clarksville home. He stated that he had a good relationship with his wife, tried to spend as much time as he could with her and her daughters, and assumed the responsibility of seeing the girls off to school each morning after his wife had departed for work. He said that as time passed and the victim became interested in boys, he began to notice that she was starting to walk around the house wearing only a towel and to dress and undress without closing her bedroom door. He stated that when she persisted in her behavior,

8

despite being told by both himself and his wife that she should stop, he found himself starting to have sexual thoughts about her. The defendant testified that he struggled alone with his improper thoughts for six or seven months until his wife became upset upon finding an email he had sent to the victim in which he told her that he missed her, loved her, and needed her. At that point, he said, he confessed his improper thoughts about the victim to his wife.

The defendant denied that he ever had sexual intercourse with the victim, touched her inappropriately, or exchanged sexually explicit emails with her. He also denied that he told his daughters anything other than he had been experiencing sexual feelings for the victim. The defendant explained that in his taped conversation with Morgan he had been referring to his perception that the victim had been "throwing herself" at him, which was wrong, as were the feelings that he was experiencing toward her as a result of her behavior. He further testified that he was in an automobile accident in 1990 that injured his spinal cord and ultimately rendered him impotent and that he was only able to perform sexually by injecting himself with a prescribed medication that took fifteen to twenty minutes to take effect. He said the only reason he could think of for the victim to fabricate her allegations against him was that she wanted to live with her father, instead of her mother.

On cross-examination, the defendant testified that the victim knew he had had a vasectomy because he had told her about it. He said that he believed his daughters were jealous of the attention he gave his new wife and her daughters. Although he acknowledged that he was a native English speaker, the defendant insisted that the portions of his telephone conversation with Morgan in which he stated that the things he and the victim had "done" were wrong referred to her having walked around partially nude and his having had sexual thoughts about her.

During his subsequent redirect and recross examination testimony, the defendant identified his medical records relating to the treatment of his erectile dysfunction, which were then admitted as an exhibit. The defendant acknowledged that the records reflected there was nothing wrong with his libido. He testified that he could not inject himself with the prescribed medication more than once in a twenty-four-hour period because of the danger of priapism, which was the condition of experiencing an extended erection that required surgery to correct.

Kerri Ann Walker, the victim's mother, testified she had a positive, open relationship with the victim. She described the discussions she had with the victim about puberty, adolescence, and sexuality and said that the victim knew she could talk to her about anything. She testified that the victim never complained to her about the defendant's alleged behavior and that she never saw anything to make her suspect there was anything inappropriate about the defendant's relationship with the victim. Mrs. Walker stated that she and the defendant had sexual intercourse one to two times per

9

month and that ninety percent of the time the defendant had to inject himself with his medication in order to perform. She said that, after the allegations arose in the case, she checked and found nothing out of order in either the amount of the defendant's medication or the number of syringes in the house. She explained that this factor, combined with the victim's failure to tell anyone about the alleged abuse, led her to disbelieve the victim's allegations:

I have not found any proof-[the victim] never came to me and said that anything happened. She never went to anybody else. Her relationship with [the defendant] never changed. She was always happy to see him. She-I didn't suspect a thing. I didn't find anything. When I went to count the syringes, I didn't find any medication gone and he never said to me that anything happened.

Mrs. Walker said that the defendant confessed that he had been having inappropriate feelings toward the victim after she confronted him about an email in which he told the victim that he loved and needed her. She denied that she ever deleted any "sexual" emails between the defendant and the victim. She testified that whenever the victim got into trouble, she insisted that she was going to live with her father when she turned thirteen, despite being told that a change in custody would require that the family go back to court. Mrs. Walker stated that the victim once told her that she "would do anything if she could move with her father."

On cross-examination, Mrs. Walker acknowledged that after she discovered the defendant's email, she called her mother, who was a legal secretary, and asked her to talk to the victim. She denied, however, that her mother warned her that in her experience the mother always loses custody when her child has been molested while in her custody.

Several of the defendant's friends, neighbors, and co-workers testified on the defendant's behalf, expressing their opinions as to his character and veracity. Darryl McKissack testified that he had known the defendant for almost three years, had grown to love him like a brother, and knew in his heart that he was an honest person. Judy McKissack testified she was Darryl McKissack's wife, had socialized with the defendant and his wife, and believed the defendant to be an "honest, hard-working man." Emerson Russell Dowling, Jr., the defendant's neighbor, testified that he had known the defendant for about twenty-one years and that he was "a good neighbor" and "a good friend." Mary Joyce Bumpus, another of the defendant's neighbors, testified that she had known the defendant since 1981 or 1982 and that he had always been honest with her and her husband. Bumpus said that she and her husband occasionally took the defendant's stepdaughters to church, that neither child ever disclosed to her that anything inappropriate was occurring, and that the victim always appeared to be a happy, well-adjusted child. Jim Gasaway, the defendant's supervisor at Hobby Lobby, testified that the defendant was a very honest person. Finally,

10

Sidney Lee VanAntwerp, one of the defendant's co-workers at Hobby Lobby, testified that she thought the defendant was very honest. However, with the exception of Gasaway, the witnesses testified on cross-examination that they would not believe the defendant if he said he had sexual feelings for a twelve-year-old girl.

Detective Alan Charvis, recalled by the defendant, acknowledged that he did not employ the services of a computer forensic expert to attempt to recover any deleted emails. He further acknowledged that he found no pornographic materials in the defendant's home and saw no signs that the carpet or couch had recently been cleaned or replaced.

The victim's younger sister, C.M., who was twelve years old at the time of trial, testified that when she lived with the defendant at the Barkwood Court residence her bedroom was the one furthest from the living room. She said the only thing she could hear from the living room when her bedroom door was open was the television set. C.M. stated that the victim never told her of any problems she was having with the defendant and that she never suspected anything improper was going on between them. On cross-examination, she testified that it was difficult for her to hear anything from the living room when her bedroom door was shut.

Anthony Scott McClure, the victim's father, testified that he was not aware of any dramatic personality changes in the victim after her mother married the defendant. He said that the victim did not tell him about the abuse; instead, he "found out from the State of Tennessee." He stated, however, that he believed the victim's allegations and that there was "[n]o question" in his mind that the defendant had violated his daughter.

Donna Kimsey, the victim's maternal grandmother, testified that she lived in Springfield, Illinois, and was a retired legal secretary for a small law firm that did not handle any child custody or domestic cases. She said she took the victim, with whom she had always had a close relationship, to a park to talk to her after receiving a phone call from the victim's mother, who was upset over the manner in which the defendant had ended an email to the victim. Kimsey stated that she asked the victim if she was having any problems with the defendant that she wanted to tell her about and that the victim got teary, bowed her head, and said only, "I can't, I can't." Kimsey denied that she yelled or tried to intimidate the victim. She testified that she never noticed any change in the victim's personality and that the victim appeared to have a good relationship with the defendant. On cross-examination, she denied that she ever suspected that the victim was being sexually abused.

Walker, 2006 WL 3313651, at *2-10. The state court's other factual findings are set forth in the analysis of Petitioner's claims.

11

## C. Conclusions of Law

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In addition, however, with respect to claims that have been "adjudicated on the merits in State court proceedings,"

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted . . . unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Id. In sum, a federal court is bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable view of the facts. Harris v. Stovall, 212 F.3d 940, 943 (6th Cir. 2000); Franklin v. Francis, 144 F.3d 429, 433 (6th Cir.1998).

The Court must presume the correctness of state court factual determinations, and the Petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); see also Cremeans v. Chapleau, 62 F.3d 167, 169 (6th Cir.1995) ("We give complete deference to state court findings unless they are clearly erroneous."), abrogated on other grounds

12

Thompson v. Keohane, 516 U.S. 99, 111 (1995). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen v. Pinholster, —U.S. ——, ——, 131 S.Ct. 1388, 1398 (2011) (quoting Harrington v. Richter, 562 U.S. ——, —— 131 S.Ct. 770, 786 (2011); Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Cullen, 131 S.Ct. at 1399.

The Supreme Court explained that a state-court decision will be "contrary to" clear established federal precedent only if the state court "applies a rule that contradicts the governing law set forth in our cases" or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405–06 (2000). Under the "unreasonable application" clause of § 2254(d)(1), habeas relief is available if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case," or if a "state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." Harris v. Haeberlin, 526 F.3d 903, 909 (6th Cir.2008) (citations and internal quotation marks omitted).

The Supreme Court has explained that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. Wood v. Allen, 558 U.S. 290 (2010). The mere fact that "[r]easonable minds reviewing the record might disagree" about the factual finding in question "does not suffice [on habeas review] to supersede the trial court's . . . determination." Rice v. Collins, 546 U.S. 333, 341–42 (2006). Thus, a state court's factual determinations "will not be overturned on factual grounds unless objectively

13

unreasonable in light of the evidence presented in the state-court proceeding." Miller–El v. Cockrell, 537 U.S. 322, 340, (2003). A state court's application of federal law is "unreasonable" and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996))

## I. Ineffective Assistance of Counsel

Petitioner's ineffective assistance of his trial counsel claims (Docket Entry No. 2 at 18) include fourteen distinct alleged failures: (1) that his counsel ineffectively asserted the defense of impotence; (2) that his counsel failed to investigate adequately or subpoena a corroborating medical witness in Illinois; (3) that his counsel failed to investigate adequately or subpoena a social worker in Illinois; (4) that his counsel failed to persuade the trial court to suppress the Petitioner's recorded statements to his daughter; (5) that his counsel failed to present the testimony of Randy Hultberg; (6) that his counsel failed to inform the Petitioner of counsel's prior representation of Petitioner's daughter on an unrelated matter; (7) that his counsel allowed evidence of Petitioner's prior bad acts; (8) that his counsel failed to argue that the State must elect offenses; (9) that his counsel "failed to object"; (10) that his counsel failed to object to the jury having a copy of the transcript of the tape-recorded conversation during deliberations; (11) that his counsel forced witnesses to call other witnesses liars; (12) that his counsel allowed the Petitioner to be presented with a "Hobson's Choice" of remaining silent and allowing the jury to consider his statements contained in a recorded telephone conversation with his daughter, or testifying in order to rebut said statements; (13) that his counsel failed to request a jury instruction for "contradiction statements instead of inconsistencies"; and (14) that his counsel failed to adequately advise Petitioner with respect to the State's proposed

14

plea agreement.

In Petitioner's state post-conviction appeal, the Tennessee Court of Criminal Appeals made the following factual findings about Petitioner's trial counsel:

> The Petitioner filed a timely petition for post-conviction relief in which he alleged that his trial counsel was ineffective in several ways. At the hearing on the petition, the following evidence was introduced: The Petitioner testified that he was serving a twenty-year sentence for his rape convictions. He said the attorney ("Counsel") who represented him during his trial was ineffective because he failed to adequately investigate his case. He also claimed that Counsel used a defense of impotence but failed to introduce available medical records regarding his medical condition. The Petitioner said Counsel also failed to subpoena the impotence specialist, Dr. Douglas Trapp, who the Petitioner had seen with regard to his condition. The Petitioner felt Dr. Trapp's testimony would have helped the jury understand that he had to inject himself to become erect and that these injections only took effect after a certain time period. The Petitioner felt that Dr. Trapp's testimony would also have refuted the State's claim that he had engaged in sexual intercourse with the victim every day, sometimes more than once a day, because the doctor would have testified that the Petitioner could not inject himself more than once in a twenty-four hour period.
>
> The Petitioner also testified that Counsel failed to submit into evidence the report from the doctor in Illinois who examined the victim. The Petitioner said this doctor's report included the results of the victim's pelvic exam, which were inconclusive. The Petitioner said Counsel had this report but that Counsel never spoke with the doctor. When Counsel tried to introduce the report into evidence at trial, the court ruled the report was inadmissible hearsay.
>
> The Petitioner alleged that Counsel had a conflict of interest when Counsel represented him because Counsel had previously represented the Petitioner's daughter and did not inform the Petitioner of this fact. The Petitioner said Counsel did not challenge his daughter's credibility when she testified against him during his trial. Further, the Petitioner said Counsel vouched for his daughter's credibility by saying during closing argument that Counsel knew that the Petitioner's daughters were not lying. The Petitioner said that, had he known of this conflict, he would not have allowed Counsel to represent him.
>
> The Petitioner testified that Counsel was ineffective in dealing with the Petitioner's uncharged conduct toward the victim. He said Counsel filed a motion in limine to exclude testimony of any uncharged acts, and the trial court granted this motion. The State, however, introduced testimony about uncharged conduct, and Counsel only objected once. Further, Counsel himself introduced instances of uncharged conduct.

15

The Petitioner said Counsel was ineffective for mentioning these crimes, evidence of which the trial court had ruled inadmissible. Further, the Petitioner believed that the jury's repeated exposure to this uncharged conduct affected the verdict.

The Petitioner alleged that Counsel was ineffective for failing to object to the jury receiving, during deliberations, a copy of the transcript of the taped conversation between the Petitioner and his daughter. He said this allowed the jury to place great weight on this prejudicial evidence. About this same conversation, the Petitioner said Counsel was ineffective for failing to assert that his daughter's taping of this conversation, at the behest of law enforcement, violated his right against self-incrimination. Further, the tape was played for the jury before the Petitioner said whether he was going to testify, which he says forced him to testify. The Petitioner said he wished that Counsel had tried harder to exclude the tape.

The Petitioner's next set of allegations involved Counsel's failure to object to actions by the prosecutor. He testified the prosecutor improperly referred to evidence not submitted to the jury, including destroyed emails. The Petitioner said the prosecutor also improperly referred to "the Lolita complex" in front of the jury, which the Petitioner later learned was a reference to a book written about child pornography. The Petitioner said Counsel's failure to object allowed the jury to assume that the Petitioner was involved in child pornography. He further asserted that there is a federal case indicating that references to "Lolita" were improper.

The Petitioner testified that Counsel should have objected when the prosecutor improperly challenged the credibility of several witnesses by forcing them to call other witnesses liars. The Petitioner said the prosecutor called his wife a "perjurious liar," which was an improper comment on her testimony. The prosecutor also said that the Petitioner's mother-in-law had called her daughter a liar during the mother-in-law's trial testimony. The Petitioner also felt Counsel should have objected when the prosecutor "vouch[ed] for the credibility [of] certain witnesses."

The Petitioner testified that Counsel told him that the State had offered to settle the case and that, in exchange for his guilty plea, he would receive eight years at one hundred percent. Counsel told the Petitioner not to take the plea deal, saying that the Petitioner possibly would not live eight more years considering his poor health. The Petitioner testified that Counsel never told him, however, that he was facing 120 years in prison if he was found guilty on all the counts. The Petitioner said, had he understood the ramifications of the charges against him he would have taken the plea offer.

The Petitioner next asserted that Counsel failed to investigate or interview the social worker in Illinois. The social worker's report included conflicting statements and statements that contradicted the victim's trial testimony. In one instance, the victim

told the social worker she had never performed oral sex on the Petitioner, but she testified at trial that she performed oral sex on the Petitioner. Counsel attempted to put that evidence before the jury, but it was excluded as hearsay. The Petitioner testified that Counsel neither called the social worker to testify nor ensured her testimony could be admitted by other means.

On cross-examination, the Petitioner conceded that, at trial, the victim was forced to read the contradictory statements that she had made to the social worker into the record in front of the jury. About the expert testimony of Dr. Trapp, the Petitioner agreed that there was testimony in the record that the Petitioner could only inject himself with one vial of medicine during a twenty-four hour period, but he said the doctor's testimony would have been more persuasive. The Petitioner said he was still, at the time of the post-conviction hearing, unaware of the capacity in which Counsel had represented his daughter. He said this was the reason he did not know whether or not he would have allowed Counsel to continue to represent him had he known of the conflict.

The Petitioner agreed that the trial court ruled that testimony about fellatio, which was uncharged conduct, could not be admitted during trial. He disagreed that Counsel may have let this testimony in for a strategic reason, namely to show that the victim's statements to a social worker in Illinois varied greatly from her trial testimony.

Counsel testified that he investigated the Petitioner's impotence defense by obtaining the Petitioner's medical records. He and the Petitioner discussed whether to present expert testimony on the matter and the expense of so doing, and they both agreed that the testimony of the Petitioner and his wife on this matter would be sufficient. Counsel said he and the Petitioner had been friends before this case, and, as such, Counsel was well aware of the Petitioner's impotence and the car wreck that precipitated his impotence.

Counsel testified that he contacted the Petitioner's daughter, C.M., whom he described as "very hostile" toward him, and C.M. did not want to talk to him. Counsel filed a motion to suppress the tape-recorded conversation between the Petitioner and C.M. In the motion, he relayed the circumstances surrounding the conversation, saying that the Petitioner called him on a Sunday and explained the allegations he faced. He told the Petitioner not to speak to anyone including law enforcement and family members and to come to his office the following day. When the Petitioner was asked by law enforcement to provide a statement, the Petitioner refused. Law enforcement approached the Petitioner's daughter and asked that she record a conversation with her father. The Petitioner engaged in the conversation with his daughter, which was played for the jury. Counsel said he argued "vehemently" to keep that conversation out, but the trial court ruled against him. Counsel said he incorrectly assumed that, once it was introduced as an exhibit, the

17

jury was entitled to have it during deliberations, thus he did not object to the tape being taken into the jury room.

Counsel testified that he disclosed to the Petitioner that he had previously represented the Petitioner's other daughter, A.W. He said he told the Petitioner that, because he had represented A.W., he thought she would speak to him about this case. The Petitioner provided Counsel with A.W.'s telephone number, and Counsel called A.W. while the Petitioner was present. Counsel said A.W. was not hostile toward the Petitioner at trial, unlike the Petitioner's other daughter, C.M.

Counsel testified that he was provided discovery in this case, which included a report that showed that the victim's pelvic exam was inconclusive. He said he attempted to have the report admitted in court, but the trial court denied his motion. Counsel agreed that it would have been possible for him to issue a subpoena and take a deposition of the doctor who created the report. He said he discussed this with the Petitioner, and the two decided that Counsel should not take this measure based upon the expense and also upon the fact that they did not want the story of the victim, who was only twelve or thirteen, admitted through this deposition. Counsel agreed that he could have asked that the medical report be admitted as a business record if he requested that the custodian of records make the report a business record.

On cross-examination, Counsel testified that the Petitioner was not incarcerated before the trial and that there was a long delay between his arrest and the trial due to the Petitioner's poor health. During this delay, which lasted approximately eighteen months, Counsel met with the Petitioner regularly. In the last two weeks before the Petitioner's trial, the Petitioner was at Counsel's office several hours each day.

Counsel agreed that, before trial, the State offered to settle the case if the Petitioner agreed to serve eight years at 100%. Counsel relayed this offer to the Petitioner, who had recently been released from the hospital after suffering a brain aneurysm. The Petitioner said that eight years was a "death sentence" given his medical condition and asked Counsel what his chances at trial were. Counsel said he told the Petitioner that he thought the odds of the Petitioner's being found guilty were "fifty-fifty." Counsel said that he went through the indictment with the Petitioner and discussed the minimum and maximum sentence for each charge the Petitioner faced.

Counsel testified that he filed a motion in limine to exclude testimony about the victim performing fellatio upon the Petitioner because the Petitioner was not charged with this conduct. The trial court granted this motion. Counsel explained that, before trial, he was aware that the victim told a social worker in Illinois she had never performed fellatio on the Petitioner. Based on this inconsistency with her earlier statement to the Illinois social worker, Counsel did not object to her testimony at trial that she had in fact performed fellatio in order to impeach her with the social

18

worker's report. Counsel recalled that there were several instances during the victim's testimony where she contradicted the statement she gave the Illinois social worker, which he brought out during his cross-examination of the victim.

Counsel testified that he did not find the victim in this case credible. He said that, in addition to her contradictory statements to the Illinois social worker, there was no DNA evidence to corroborate the victim's story. Counsel recalled that the victim said that she and the Petitioner engaged in sexual conduct almost every day in various places in the house, including the couch and the carpet. When law enforcement officers searched those places for residual bodily fluids, they found no physical evidence to support the victim's allegations.

Charles Walker v. State, No. M2010-0449- CCA-R3-PC, 2011 WL 795866, at *10-13 (Tenn. Crim. App. March 8, 2011) (perm. app. denied July 14, 2011).

To establish ineffective assistance of counsel, a movant must show: (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that a "reasonable probability" exists that the performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687-94 (1984). In reviewing counsel's performance, the Court must "indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." Id. at 689. Prejudice is a "reasonable probability that, bur for counsel's unprofessional errors, the result of proceeding would have been different." Id. at 694.

"A determination of the prejudice prong of the Strickland analysis is necessarily dependent on a review of the merits of [Movant's] . . . claim." Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990). Thus, the Court considers the merits of the underlying claims giving rise to Movant's ineffective assistance of counsel allegations.

### 1. Impotence Defense

As to Petitioner's claim of trial counsel's failure to investigate his medical condition of

19

impotence, the Tennessee appellate court found the lack of prejudice as follows:

> **[W]e need not address counsel's performance, which does not appear deficient, because the Petitioner clearly cannot show prejudice.**
>
> \* \* \*
>
> **During the Petitioner's trial, both the Petitioner and his wife testified about his difficulties maintaining an erection without medication, and Counsel introduced medical records that supported this testimony. The Petitioner failed to provide any additional testimony at the hearing on his petition for post-conviction relief, in the form of his doctor's testimony or additional medical records, that would show how his doctor's testimony would have added to the testimony already presented to the jury.** In the absence of any additional evidence, **we are left to speculate about how the Petitioner's doctor's testimony would have aided his defense.** Under these circumstances, we conclude that the Petitioner cannot show prejudice and is not entitled to post-conviction relief on this issue.

Walker, 2011 WL 795866, at *16.

To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. See Bell v. Cone, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. See Strickland, 466 U.S. at 686-87; Combs v. Coyle, 205 F.3d 269, 278 (6th Cir. 2000), cert. denied, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. Bigelow v. Williams, 367 F.3d 562, 570 (6th Cir. 2004).

To establish prejudice due to his counsel's errors or omissions, Petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

The Court's determination of an ineffective assistance of counsel claim must consider the totality of the evidence. Id. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" West v. Seabold, 73 F.3d 81, 84 (6th Cir. 1996) (quoting United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689.

In summarizing Supreme Court precedents, the Sixth Circuit explained:

In Cronic[2], the supreme court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." . . . In Williams[3], the supreme court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice, provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel.

Mitchell v. Mason, 325 f.3d 732, 740 (6th Cir. 2003) (citations and parenthetical omitted).

Within the first category are three types of cases warranting the presumption of prejudice arising from counsel's acts or omissions:

---

[2] United States v. Cronic, 466 U.S. 648 (1984).

[3] Williams v. Taylor, 529 U.S. 362 (2000).

The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" <u>Bell</u>, 122 S.Ct. At 1851 (quoting <u>Cronic</u>, 466 U.S. at 659). The second is when counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing.'" <u>Id.</u> (quoting <u>Cronic</u>, 466 U.S. at 659). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

<u>Id.</u> at 742. Petitioner's claim does not fall within any of these categories and thus, a "strong presumption" arises that petitioner's counsel provided reasonably effective assistance. <u>Strickland</u>, 466 U.S. at 689.

As these principles apply here, Petitioner's counsel in fact introduced medical records that supported Petitioner's impotence defense and the state court could reasonably determine that Petitioner's trial counsel provided effective assistance on this defense. Moreover, Petitioner cannot show prejudice, as his doctor's testimony would have been cumulative. Thus, Court concludes that the state court's decision on this claim was a reasonable application of federal law.

### 2. Inconclusive Pelvic Examination of Victim

Petitioner next asserts that his trial counsel was ineffective for failing to introduce the victim's medical report into evidence. The Tennessee appellate court found on this claim as follows:

> The report of that medical exam showed that the doctor performing the victim's pelvic exam found inconclusive evidence about whether the victim had previously engaged in sexual activity. Counsel, who had been retained by the Petitioner, testified that he discussed this matter with the Petitioner before trial. He informed the Petitioner of the expense of deposing the doctor and of the risk that this deposition would lead to other damaging evidence, which the victim may have relayed to the doctor, being admitted into evidence. The two discussed alternative available evidence challenging the victim's story, namely, the Petitioner's difficulty maintaining an erection and the absence of semen from the locations in which the victim said the two had engaged in sexual activity. The Petitioner and Counsel then decided not to depose the doctor.

22

We conclude that Counsel's performance was not deficient in this regard. He discussed with the Petitioner the Petitioner's options on this issue and thoroughly reviewed the considerations with him. He and the Petitioner decided together that it was better not to depose this doctor for strategic reasons. Further, the Petitioner has failed to show how he was prejudiced in this regard. He did not present the doctor's testimony at his post-conviction hearing, and a copy of this doctor's report is not included in the appellate record. He is not, therefore, entitled to post-conviction relief on this issue.

Walker, 2011 795866, at *17.

The Court presumes the correctness of state court factual determinations. Thus, under Strickland, the Court concludes this strategic decision of defense counsel not to depose the doctor is not grounds for habeas relief. Petitioner has not shown prejudice on this claim.

### 3. Illinois Social Worker

Petitioner's next claim is that his trial counsel was ineffective for not calling Karen Morelock, a social worker in Illinois who interviewed the victim, as a witness. Alternatively, Petitioner asserts counsel should have sought to admit Morelock's statements under the business exception to hearsay. In the state post-conviction appeal, the Tennessee Court of Criminal Appeals found the lack of prejudice on this claim.

**At trial, the court allowed Counsel to impeach the victim with each of the inconsistencies he identified in Morelock's report. The victim was forced to read aloud to the jury portions of Morelock's report about their interview.** In our opinion on direct appeal, we summarized the cross-examination, stating:

On cross-examination, the victim acknowledged that she told Karen Morelock, the Illinois social worker who interviewed her on July 5 and July 19, 2001, that she thought she was the one who had deleted the emails, that she did not do anything with her mouth to the defendant, and that the sexual touching started in January 2000, as opposed to January 1999 as she stated in her direct examination testimony. At defense counsel's request, the victim read the following portion of her July 19 statement aloud: "I wouldn't do anything with my mouth to him, but he would lick my genital area." She agreed that the following statements in her July 19 statement were true: "It would be everyday beginning in January 2000"; "He would lick me, I had sex with him everyday for over one year"; and "[E]very once in a while, we

23

would have sex one time in the morning and then when I would get home from school." The victim also testified, however, that her statement on direct examination that the abuse began in 1999 was true. She said the defendant first began touching her in January 1999, when she was ten years old and within a few months of his October 1998 marriage to her mother.

**In light of this cross-examination, we conclude the Petitioner has not proven that he was prejudiced by Counsel's failure to have Morelock testify or to have her report independently admitted into evidence.** It is clear from the record that the Petitioner was able to expose to the jury any and all inconsistencies between Morelock's report and the victim's trial testimony. He is not entitled to post-conviction relief on this issue.

Walker, 2011 WL 795866, at *17-18 (emphasis added).

Petitioner's trial counsel was able expose the victim's inconsistencies in her statements through his cross-examination of the victim. Thus, under Strickland, Petitioner fails to show that Morelock's testimony would have had any greater impact.

The Court concludes that Petitioner fails to show that the state court's determination that Petitioner was not prejudiced in light of the victim's cross-examination was an unreasonable determination of the facts and federal law by the state courts.

#### 4. Suppression of Petitioner's Statement

Petitioner next asserts that his trial counsel was ineffective when he failed to have Petitioner's recorded statements suppressed. The Tennessee Court of Criminal Appeals found his counsel unsuccessfully sought to do so.

Before trial, Counsel filed a motion to suppress this tape recorded conversation, and he testified he argued "vehemently" to keep that conversation out, but the trial court ruled against him. The record shows that the Petitioner, who was not in police custody at the time, made these statements during a tape recorded conversation with his daughter. The record does not, however, include a copy of the motion to suppress or a copy of the transcript of the hearing on the motion to suppress. We are, therefore, left to speculate as to the arguments Counsel put forth. In any event, Counsel's performance was not deficient in that he attempted, albeit unsuccessfully, to suppress

24

the Petitioner's statements. Further, the Petitioner has not successfully proven how he was prejudiced. The Petitioner is not entitled to relief on this issue.

Walker, 2011 WL 795866, at *18.

Given counsel's attempts to suppress Petitioner's statements, the Court concludes that the state court reasonably determined that Petitioner failed to show counsel deficient on this claim.

### 5. Testimony of Randy Hultberg

Petitioner's next claim is that his trial counsel was ineffective because he failed to present the testimony of Randy Hultberg. The Tennessee Court of Criminal Appeals ruled this claim was without merit for lack of proof and was subject to waiver under state law.

The Petitioner did not call Hultberg to testify at the post-conviction hearing, and it is unclear from the Petitioner's brief what he thinks Counsel should have done differently.

Because the Petitioner presented no evidence at the post-conviction hearing to support this argument and because he makes no citations to any authority to support his argument, we conclude he has waived our review of this issue. The Rules of Appellate Procedure require that citations to authority and references to the record be included in the argument portion of the brief. Tenn. R.App. P. 27(a)(7). The rules of this Court also contemplate waiver of issues not supported by citation to authorities or appropriate references to the record. *See* Tenn. R. Ct.Crim.App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). We deem this issue waived due to the failure to cite to any legal authorities.

Id.

"[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions." Estelle, 502 U.S. 62, 67-68. Petitioner fails to show that the application of state law by the state courts was contrary to or involved an unreasonable application of clearly established federal law or that the decisions were based on an unreasonable determination of the facts in light of the evidence presented.

25

As to Petitioner's claim regarding counsel's failure to present testimony of Randy Hultberg, this claim was not sufficiently presented to the state courts and also is barred under Coleman v. Thompson, 501 U.S. 722 (1991), the procedural default doctrine. The rationale for this doctrine arises out of judicial respect for federalism and maintaining comity with state courts. Id. At 730-32. The doctrine also serves a legitimate state interest in finality fo state convictions. Francis v. Henderson, 425 U.S. 536, 542 (1976). State procedural rules that channel the controversy to the state trial and appellate courts must be honored because failure to do so "deprives the [state] appellate court of an opportunity to review trial error, and 'undercut[s] the State's ability to enforce its procedural rule[s]'" Murray v. Carrier, 477 U.S. 478, 491 (1986).

Tennessee's waiver statute has been held to serve a legitimate state interest and is regularly enforced for purposes of procedural default. See Hutchison v. Bell, 303 F.3d 720, 738 (6th Cir. 2002). Petitioner did not sufficiently present this ground for his ineffective assistance of counsel claim before the state courts and under state rules that claim is waived. Thus, under Coleman, the Court concludes this claim is procedurally barred without any showing of cause or prejudice. Aside from procedural default, Petitioner did not offer any proof on this claim.

### 6. Counsel's Prior Representation of Petitioner's Daughter

Petitioner's next claim is that his trial counsel was ineffective because counsel failed to disclose his previous representation of Petitioner's daughter, A.W., who testified at trial. The Tennessee Court of Criminal Appeals found this claim to be meritless, reasoning as follows:

Counsel testified at trial that he disclosed to the Petitioner his previous representation

of the Petitioner's daughter, A.W., on an unrelated matter and that he had a good relationship with her. He said that the Petitioner provided him A.W.'s phone number, and he called A.W. while the Petitioner was present to discuss the Petitioner's case. Counsel testified that, unlike the Petitioner's other daughter, C.M., A.W. was not hostile toward the Petitioner during the trial, which he attributed to his phone conversation with her. At the post-conviction hearing, the Petitioner was much less certain than in his brief about whether he would have allowed Counsel to continue representing him had he known of his representation of A.W., testifying that he did not think that he would have allowed Counsel to represent him. The Petitioner acknowledged at the post-conviction hearing that he did not know the details of that prior representation, and he presented no evidence about the details of that representation by calling A.W. to testify or by questioning Counsel in depth on this matter.

The post-conviction court, crediting Counsel's testimony, found that Counsel informed the Petitioner about his previous representation of A.W., and the Petitioner did not object to Counsel's continued representation of the Petitioner. We conclude that the evidence does not preponderate against this finding. The Petitioner has neither proven that Counsel was deficient in this regard nor that he was in some way prejudiced. He is not, therefore, entitled to post-conviction relief on this issue.

Walker, 2011 795866, at *19.

The Court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell, 325 F.3d at 737-38 (citing 28 U.S.C. § 2254(e)(1)). Despite his contention that he did not know of counsel's prior representation of his daughter, Petitioner does not offer evidence supporting such contentions. The state court's finding is to the contrary and is supported by the record. Thus, the Court concludes that Petitioner fails to show that the state court's decision on this claim was contrary to federal law or an unreasonable determination of this claim.

### 7. Prior Bad Acts

Petitioner's next claim is that his trial counsel was ineffective for not objecting to the State's introduction of his "prior bad acts," notably the victim's uncharged instances of fellatio. On this

claim, the Tennessee Court of Criminal Appeals found:

> The Petitioner next asserts that Counsel was ineffective for not objecting to the State's introduction of his "prior bad acts," i.e. uncharged instances of fellatio testified to by the victim, and that Counsel was also ineffective for introducing such evidence himself. Counsel filed a motion in limine to have these instances of fellatio excluded, and the trial court granted this motion. The Petitioner points to Counsel's opening statement in which he stated that the jury would hear that the victim was going to testify that she and the Petitioner engaged in sexual activity every day, which was a direct violation of the motion in limine.
>
> It is apparent from the trial transcript and Counsel's testimony at the post-conviction hearing that the defense strategy was to impeach the victim's credibility in several ways. Counsel sought to impeach the victim's testimony that she and the Petitioner engaged in sexual activity every day, sometimes twice a day, with the following evidence: that the Petitioner required an injection to maintain an erection; that he could not take such medication more than once per day; that there were only a few vials of the injection missing from the Petitioner's supply and that his wife could account for their use; that no bodily fluids were found by law enforcement in the places where the victim said the intercourse occurred; and that the victim made contradictory statements about the frequency, nature, and duration of the sexual contact. Counsel decided that it was to the Petitioner's advantage to have these instances brought in to bolster the argument that the victim was being untruthful and to prove that her testimony was improbable.
>
> This Court addressed this issue during the Petitioner's direct appeal. We concluded that Counsel's failure to argue for the suppression of this evidence was deliberate and an "effort to point out the inconsistencies and improbabilities in the victim's accounts to the Illinois social worker." When ruling on this issue, the post-conviction court found, "Using these [instances of prior bad acts] was to the advantage of the Petitioner not to his disadvantage ." We agree. While, in hindsight, there may have been another defense strategy that may have been more successful, the one that Counsel asserted was reasonable in light of the evidence. The fact that a particular strategy or tactic failed does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515. The Petitioner is not entitled to relief on this issue.

Walker, 2011 795866, at *19-20.

Applying state law, the Criminal Court of Appeals determined that Petitioner's trial counsel's strategy was reasonable in light of the evidence. Petitioner fails under Strickland to show that

28

counsel's strategic decision to allow the introduction of uncharged "bad acts" to impeach the victim's testimony was deficient or that Petitioner was prejudiced as a result.

## 8. Election of Offenses

Petitioner's next claim is that his trial counsel's assistance was ineffective because he failed to argue that the state must elect offenses. On direct appeal, the Tennessee Court of Criminal Appeals stated:

> We agree with the defendant that an election of offenses and enhanced unanimity instruction should have been given. However, we find the error to have been harmless with respect to Counts One and Six. Although the victim testified that she had had sexual intercourse with the defendant on numerous different occasions and locations during the time she lived with him at the Barkwood Court residence, she described only two incidents in detail: the May 28, 2001, rape in the living room and the second rape that occurred in the living room during the school spring break of 2001. There was, therefore, no danger that the jurors might have been considering different offenses when deliberating on those counts. Such a danger did exist, however, with respect to the aggravated sexual battery count of the indictment. That offense was narrowed as to time and act, but the proof at trial did not correspond to the time frame selected and there was evidence of more than one occasion on which the act of masturbation occurred.

> Our supreme court addressed a similar situation in *State v. Brown*, 992 S.W.2d 389 (Tenn.1999), in which a child rape victim testified about multiple instances of penetration, the State did not elicit identifying details from the victim about the single count for which the defendant was on trial, and the proof did not correspond to the time frame the State selected for the offense:

> The prosecution did not attempt to clarify the victim's testimony, or clarify the conflicts in the testimony, either by eliciting additional details or by relating the timing of the abuse to some other occasion in the victim's life. Moreover, instead of relying upon the few details that were elicited, for example, an incident that occurred on a Friday when it was warm, to make the election, the prosecution did not elect a specific offense but simply narrowed the time-frame of the charged offense from the period alleged in the indictment (March 1, 1993, to September 30, 1993) to an offense occurring between Easter, April 11, 1993, and June 30, 1993. This time-frame limitation was not an election and failed to ensure that the jury would focus on a single offense.

29

Moreover, as the State now concedes on appeal, the deficiency in the election at trial was further compounded by the fact that the time-frame chosen by the prosecutor was simply inaccurate. A close reading of the testimony reveals that the victim testified that acts of digital penetration were committed by Brown in Brown's trailer prior to the occasion on which Brown took the photographs of the victim. The victim's mother testified that she saw the photograph of the victim prior to Easter, April 11, 1993. The State nonetheless "elected" an offense between April 11, 1993 and June 30, 1993–a period for which the victim described no specific offenses. Accordingly, even had the elected offense been sufficiently detailed, the evidence did not support the time-frame selected by the State.

*Id.* at 392 (footnote omitted).

In the bill of particulars, the State identified Count Three as a masturbation that occurred in the living room of the residence in January 2000, while the defendant had his clothes on and his zipper open. The State was unable, however, to elicit those identifying details from the victim at trial, and her testimony did not establish that any masturbation occurred in January 2000. Accordingly, we must reverse the defendant's conviction for aggravated sexual battery and remand for a new trial on that offense.

*Walker,* 2006 WL 3313651, at *15–16.

Because this Court has previously addressed this issue and found the error harmless as to all convictions save one, which we reversed and remanded for a new trial, the Petitioner cannot show any prejudice with regard to Counsel's performance. He is not entitled, therefore, to post-conviction relief on this issue.

Walker, 2011 795866, at *20-21.

As the state court noted, Petitioner correctly contends that a jury instruction on an election of offenses and enhanced unanimity should have been given. Yet, the Court agrees with the state court's conclusion that the error was harmless as to counts one and six. Because the state court reversed and remanded the aggravated sexual battery count, the state court purged any potential prejudice to Petitioner. Thus, the Court concludes the exclusion of the aggravated battery count from Petitioner's conviction precludes any possible prejudice from Petitioner's allegations about his counsel on this claim.

30

### 9. Failure to Object

Petitioner next contends that his trial counsel was deficient by failing to make appropriate

objections throughout trial. The Tennessee Court of Criminal Appeals stated:

> The Petitioner's next contention reads, "Numerous times the failed [sic] to object and
> this failure prejudiced the Appellant and deprived him of his Constitutional right to
> a fair trial." In the next section of his brief, the Petitioner cites to one instance where
> Counsel, during a side bar, told the trial judge that he did not want to delay things by
> "jumping up and down objecting." There are no citations to the record, however,
> identifying the occasions on which Counsel should have objected.
>
> As previously stated, the rules of this Court contemplate waiver of issues not
> supported by citation to authorities or appropriate references to the record. *See* Tenn.
> R. Ct.Crim.App. 10(b) (stating that "[i]ssues which are not supported by argument,
> citation to authorities, or appropriate references to the record will be treated as
> waived in this court"). This issue is waived.

Walker, 2011 795866, at *21.

Upon reviewing the record, the Tennessee Court of Criminal Appeals' determination that

Petitioner's "failure to object claim" was procedurally defaulted without a showing of cause and

prejudice and was neither an unreasonable determination of the facts, nor an unreasonable

application of federal law. Moreover, as discussed previously, Petitioner fails under Strickland to

show that counsel's strategic decision to allow the introduction of uncharged "bad acts" in an effort

to impeach the victim's testimony resulted in prejudice.

### 10. Transcript of Telephone Conversation

Petitioner asserts that his trial counsel's representation was ineffective for failing to object

to a transcript of the recorded conversation between the Petitioner and his daughter that was taken

into the jury room during deliberations. The Tennessee Court of Criminal Appeals found that the

recording was a trial exhibit and thus, this claim lacks merit:

31

When ruling on this issue, the post-conviction court stated: "The court is unable to find that the Petitioner suffered any prejudice from any lack of objections. The court is not finding that [Counsel] was ineffective for not making the objections referred to by the Petitioner."

Tennessee Rule of Criminal Procedure 30.1 states, "Unless for good cause the court determines otherwise, the jury shall take to the jury room for examination during deliberations all exhibits and writings, except depositions, that have been received in evidence." The Advisory Commission Comments to this section state:

> This rule, applicable in criminal cases, is mandatory unless the judge, either on motion of a party or *sua sponte*, determines that an exhibit should not be submitted to the jury. Among the reasons why a particular exhibit might not be submitted are that the exhibit may endanger the health and safety of the jurors, the exhibit may be subjected to improper use by the jury, or a party may be unduly prejudiced by submission of the exhibit to the jury.

We conclude that the Petitioner has failed to show prejudice because the tape recording of the conversation would have been allowed into the jury room over Counsel's objection. Counsel filed a motion to suppress this tape recording, which was unsuccessful. It is likely that once the tape was made an exhibit and played for the jury, the jury would have been entitled to have the tape in the jury room. The transcript, though an accurate account of the tape, would have been open to challenge on the basis that it would have only been produced to aid the jury while the tape was played. The jury's having had the transcript in the deliberation room, however, does not undermine our confidence in the verdict. The Petitioner is not entitled to relief on this issue.

Walker, 2011 795866, at *22.

The Court acknowledges the transcript's presence in the jury room would have been open to a potential challenge. Yet, the mandatory nature of applicable state law on exhibits and Petitioner's trial counsel's prior unsuccessful attempt to suppress this taped conversation reflect that any renewed effort by Petitioner's counsel lacked a likelihood of success. Under Strickland, counsel's failure to object to the transcripts did not deprive Petitioner of a fair trial. Moreover, Petitioner has not presented any proof supporting his contention that he was prejudiced by the transcript exhibit at trial that was available for jury deliberations.

32

Petitioner fails to show that the Tennessee Court of Criminal Appeals' decision was contrary to federal law.

### 11. Forcing A Witness to Call Another Witness a "Liar"

Petitioner contends his trial counsel was ineffective when he asked the witness if the testimony of another witness was a lie. The Tennessee Court of Criminal Appeals stated:

> The Petitioner cites to a Federal case from the seventh circuit that holds that, "Because credibility questions are for the Jury, it is improper to ask one witness to comment on the veracity of the testimony of another witness." *See U.S. v. Freitag,* 230 F.3d 1019 (7th Cir.2000). In *Freitag,* the counsel for the prosecution asked the defendant, who testified, whether she herself was being truthful and whether other witnesses were being truthful. *Id.* at 1024. The *Freitag* court ultimately held, "Assuming *arguendo* that all the questions Freitag objects to are improper, we find the resulting error to be harmless." *Id.* We can find no Tennessee case adopting a holding that counsel for the defense or prosecution may not ask a witness whether another witness is truthful. The Petitioner is not entitled to post-conviction relief on this issue.

Walker, 2011 795866, at *22.

Petitioner, in his reply (Docket Entry No. 34), cites the Sixth Circuit's holding in United States v. Dickens, 438 Fed. Appx. 364, 370 (6th Cir. 2011), where the Sixth Circuit stated: "Although there may be exceptions, the general principle that credibility determinations are mean for the jury, not witnesses, applies here." Here, the Court must determine whether the state court's decision resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, **as determined by the Supreme Court of the United States**. Here, Petitioner has not shown prejudice or an unreasonable application of federal law, as determined by the Tennessee courts.

### 12. "Hobson's Choice"

Petitioner asserts that he was forced to testify because the State played his tape recorded

33

conversation with his daughter, resulting in a "Hobson's Choice." The Tennessee Court of Criminal

Appeals found this claim to be waived under state law.

> The Petitioner fails to mention what, if any, action by Counsel was ineffective.

> We conclude the Petitioner is not entitled to post-conviction relief on this issue. First, as previously discussed, Counsel did everything possible to attempt to suppress the tape recorded conversation. He filed a motion to suppress, which included the circumstances surrounding the Petitioner's daughter's initiation of this phone conversation and "vehemently" argued that motion to the trial court. Again, that motion and the hearing on that motion are not included in the record. We conclude Counsel was not deficient in this regard. Second, we conclude that any argument that the Petitioner seeks to make about the trial court's admission of this tape recording is not a proper argument for a post-conviction proceeding. The Petitioner raised several alleged errors in evidentiary rulings on his direct appeal, but he did not raise the issue of whether this tape was properly admitted. *See Walker,* 2006 WL 3313651, at * 16–17. Therefore, any objection to the trial court's evidentiary ruling is waived. *See* T.C.A. § 40–30–106(g) (2006).

Walker, 2011 795866, at *22-23.

> With these factual findings, the Court concludes that the state court's application of state law

results in a procedural default for which Petitioner has not shown cause or prejudice.

### 13. Jury Instructions for "Contradiction Statements Instead of Inconsistencies"

> Petitioner contends trial counsel was ineffective for failing to request a "jury instruction for

contradiction statements instead of inconsistencies." (Docket Entry No 2, Brief in Support of Petition

at 53). The Tennessee Court of Criminal Appeals found:

> In this portion of his brief he cites to Tennessee law that "contradictory statements by the same witness regarding a single fact cancel each other out." *See Church v. Perales,* 39 S.W.3d 149, 169 (Tenn.Ct.App.2000). There is no citation to the record and no argument about what testimony the Petitioner asserts contradicted itself, what jury instruction was given, or what Counsel should have done differently. This issue is waived. *See* Tenn. R. Ct.Crim.App. 10(b) (stating that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court").

<u>Walker</u>, 2011 795866 at *23.

This claim is procedurally barred for his noncompliance with state law in the post-conviction proceedings, and Petitioner has not shown any cause or prejudice to excuse this default.

### 14. State's Plea Offer

Petitioner asserts that his trial counsel failed to advise Petitioner adequately about the State's plea offer of eight years. The Tennessee Court of Criminal Appeals found this claim lacks factual merit.

> At the post-conviction hearing, Counsel testified that, before trial, the State offered to settle the case if the Petitioner agreed to serve eight years at one hundred percent. Counsel said he relayed this offer to the Petitioner, who had recently been released from the hospital after suffering a brain aneurysm. Counsel said the Petitioner responded that eight years was a "death sentence" given his medical condition and then asked Counsel what Counsel believed his chances at trial were. Counsel said he told the Petitioner that he thought the Petitioner's odds of being found guilty were fifty-fifty. Counsel said that he went through the indictment with the Petitioner and discussed the minimum and maximum sentence for each charge the Petitioner faced.

> We conclude the Petitioner has not proven by clear and convincing evidence that Counsel was deficient in this regard. The Petitioner testified that Counsel urged him to reject the plea offer, emphasizing the likelihood that the Petitioner would die within the next eight years and that Counsel did not inform him of the potential sentence he could receive if found guilty. Counsel, however, testified the Petitioner raised the possibility that he would die before the end of an eight-year sentence, not Counsel, and rejected the State's offer on that basis. Counsel also testified that he informed the Petitioner of the sentences he could receive if found guilty. By denying post-conviction relief on this basis, the post-conviction court necessarily found Counsel's testimony more credible than that of the Petitioner. We will not disturb that finding. The Petitioner is not entitled to relief on this issue.

<u>Walker</u>, 2011 795866 at *23.

To establish prejudice in the context of a guilty plea, the Petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would

35

have insisted on going to trial." <u>Hill v. Lockhart</u>, 474 U.S. 52, 58-59 (1985); <u>Miller v. Straub</u>, 299 F.3d 570, 578 (6th Cir. 2002). In addition, the Court must presume that state court determinations of factual issues are correct, and Petitioner must rebut them by clear and convincing evidence. Yet, with the post-conviction court's factual findings and Petitioner's lack of proof that counsel was deficient in informing Petitioner of his options, the Court concludes that the state courts reasonably applied federal law in rejecting this claim.

## II. Prosecutorial Misconduct

Petitioner contends the prosecutor committed numerous acts of misconduct, depriving him of due process and a fair trial. The Tennessee Court of Criminal Appeals concluded Petitioner failed to raise a prosecutorial misconduct claim at trial, resulting in the claim's procedural default. <u>Walker</u>, 2011 WL 795866, at *24.

If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted. <u>Coleman</u>, 501 U.S. at 731-32. A habeas petitioner who fails to comply with state rules of procedure governing the timely presentation of federal constitutional issues forfeits the right to federal review of those issues, absent cause for the noncompliance and some showing of actual prejudice resulting from the alleged constitutional violations. <u>Gray v. Netherland</u>, 518 U.S. 152, 162 (1996). Here, Petitioner fails to show that his prosecutorial misconduct claims were raised during direct appeal, and subsequently fails to show cause for failing to raise said claims in his direct appeal. Thus, the Court concludes that the state appellate court's conclusion on this claim is not contrary to applicable federal law.

## III. Cumulative Error

The Tennessee Court of Criminal Appeals denied Petitioner's cumulative error claim because

36

it found no error. The Court need not address Petitioner's cumulative error claim in this action. "[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006).

## IV. Sentencing Violation

Petitioner contends that his sentence is illegal because, under State v. Gomez, 239 S.W.3d 733 (Tenn. 2007), the Tennessee Supreme Court erred by not reducing his sentence by finding applicable mitigating factors. The Tennessee Court of Criminal Appeals concluded that Petitioner presented this claim for the first time upon post-conviction review. Like Petitioner's prosecutorial-misconduct claims, the Tennessee Court of Criminal Appeals concluded Petitioner's sentencing-violation claims were waived under Tennessee law because Petitioner failed to present sentencing-violation claims at the earliest possible proceeding. Walker, 2011 WL 795866, at *24-25 (referencing Tenn. Code Ann. § 40-30-106(g)). Thus, under Coleman, the Court concludes this claim is procedurally barred without any showing of cause or prejudice.

## V. Character Evidence

Petitioner contends that the trial court violated his due process rights by prohibiting defense witnesses from expressing their opinions as to Petitioner's character with children. The Tennessee Court of Criminal Appeals concluded that the trial court erred in limiting character evidence to evidence of truthfulness, yet the Court also concluded that error was harmless. Walker, 2006 WL 3313651, at *18. "No judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits." Id. at *19 (citing Tenn. R. Crim. P. 52(a)). In concluding the error was harmless, the Tennessee appellate court stated that

37

because "defense witnesses, by testifying that they would not believe the defendant if he told them he had sexual feelings for a child, [they] were able to convey their opinions as to the defendant's character with children." Id.

Moreover, for a state evidentiary ruling to violate the Due Process Clause, it must be "so egregious that it results in a denial of fundamental fairness." Sanborn v. Parker, 629 F.3d 554, 575 (6th Cir. 2010) (citing Bugh v. Mitchell, 329 F.3d 496, 512 (6th Cir. 2003). Here, the Court concludes that Petitioner fails to show that the Tennessee Court of Criminal Appeal's harmless error finding was fundamentally unfair or an unreasonable application of law, or resulted from an unreasonable determination of the facts presented in the state court proceeding.

For these collective reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed here within.

**ENTERED** this _11th_ day of December, 2012.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court

38